UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br>100 F. Street, NE<br>Washington, D.C. 20549-6030<br><br>          Plaintiff,<br><br>   v.<br><br>AB VOLVO<br>40508 Goteborg<br>Sweden V7<br><br>          Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges that:

## SUMMARY

1. From approximately 1999 through 2003, AB Volvo ("Volvo") violated the books and records and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") when two of its subsidiaries and their agents and distributors made approximately $6,206,331 in kickback payments, and authorized additional payments of $2,388,419 in connection with their sales of humanitarian goods to Iraq under the United Nations ("U.N.") Oil for Food Program. Volvo's subsidiaries and their distributors authorized and paid kickbacks to Iraq in the form of "after-sales service fees" on sales of its products to Iraq. One of Volvo's subsidiaries also made other types of illicit payments to Iraq. Volvo knew or was reckless in not knowing that kickbacks were paid or agreed

to in connection with each of its subsidiaries' transactions. Volvo knew that such payments were prohibited by the Oil for Food Program and U.S. and international trade sanctions on Iraq.

2. The Oil for Food Program provided humanitarian relief to the Iraqi population during the time that Iraq was subject to international trade sanctions. The program required that Iraq could purchase necessary humanitarian goods and related services through a U.N. escrow account. However, the kickbacks paid in connection with Volvo's subsidiaries' sale of goods to Iraq had the effect of diverting funds out of the escrow account and were paid by third parties into Iraqi-controlled accounts at banks in countries such as Jordan.

3. In paying "after-sales service fees" and other illicit payments to Iraq outside of the confines of the U.N. program, Volvo failed to accurately record in its books and records the kickbacks that were authorized for payment to Iraq. Volvo also failed to devise and maintain a system of internal accounting controls to detect and prevent such illicit payments.

4. As a result of this conduct, Volvo violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## JURISDICTION

5. This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Volvo, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the

mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6. Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Volvo does business in this judicial district and certain acts or transactions constituting the violations by Volvo occurred in this district.

## DEFENDANT

7. **AB Volvo** ("Volvo"), a Swedish company headquartered in Goteburg, Sweden, is a provider of commercial transport solutions, including trucks, buses and construction equipment. Throughout the relevant period, Volvo's American Depositary Receipts were registered pursuant to Section 12(g) of the Exchange Act and quoted on the NASDAQ (symbol: "VOLV"). In December 2007, Volvo delisted its ADRs and applied for termination of its registration with the Commission. Two Volvo subsidiaries, Renault V.I. and Volvo Construction Equipment International were involved in sales of commercial vehicles and parts to Iraq during the Oil for Food Program. Volvo is not the company that currently manufactures the "Volvo" brand car.

## RELEVANT ENTITIES

8. **Renault V.I.** ("Renault Trucks"), currently called Renault Trucks SAS, is a wholly-owned subsidiary of Volvo located in Lyon, France. Renault Trucks was purchased by Volvo in January 2001 and its name was changed to Renault Trucks SAS in January 2005.

9. **Volvo Construction Equipment International** ("VCEI") was a wholly-owned Swedish subsidiary of Volvo headquartered in Eskilstuna, Sweden. In January

3

2006, VCEI merged into Volvo Construction Equipment AB. VCEI sold heavy construction equipment, including excavators and wheel loaders.

## FACTS

### I. The United Nations Oil for Food Program

10. On August 2, 1990, the government of Iraq, under Saddam Hussein, invaded Kuwait. Four days later the United Nations Security Council voted to enact U.N. Resolution 661, which prohibited member states from trading in any Iraqi commodities or products. The United Nations continued to enforce these sanctions until 2003.

11. On April 14, 1995, the United Nations Security Council adopted Resolution 986, which authorized the Government of Iraq to sell oil on the condition that the proceeds of all of its oil sales be deposited in a bank account monitored by the United Nations and used only to purchase designated humanitarian goods for the benefit of the Iraqi people. In May 1996, the Government of Iraq entered into a written Memorandum of Understanding to implement Resolution 986.

12. The United Nations Office of Iraq Program, Oil for Food (the "Oil for Food Program" or "Program") was subsequently established to administer Iraq's sale of oil and purchase of humanitarian goods by Iraq. A special bank account was established at a bank in New York (the "UN Escrow Account") to handle the transactions. The United Nations' economic sanctions on Iraq remained in place for all trade and transactions not authorized by the Oil for Food Program.

13. Starting in the middle of 2000, the Iraqi government made a concerted effort to subvert the Program by demanding secret kickbacks from its humanitarian goods suppliers. Although contracts entered into pursuant to the Program were subject to UN

4

review and approval, the Program gave Iraq discretion to select the companies from which it purchased goods. A humanitarian supplier would submit a bid for the sale of its goods. After the Iraqi ministry would accept the bid, the ministry would inform the supplier of the requirement that the supplier make a secret payment in the form of an "After-Sales Service Fee" ("ASSF") to Iraq in order to win the contract. The Iraqi ministry would also inform the supplier that the ASSF would have to be paid prior to the goods entering into the country, or the goods would be stopped at the border until the ASSF payment was paid.

14.  Initially, when this scheme first began, suppliers met with the Iraqi ministries in person and signed a side agreement acknowledging that the supplier would make the illicit payment.[1] By October 2000, this fee was usually ten percent of the total contract value. Later in the scheme, everyone understood that the ten percent would have to be paid. Thus, side agreements were no longer needed -- the supplier would simply increase its original contract bid by ten percent.

15.  The supplier would then submit its contract with the inflated contract price to the UN for approval, and not disclose the ten percent illicit payment, which was in violation of the Program rules. The supplier would pay the ASSF to Iraq prior to shipping its goods. Afterwards, the UN Escrow Account would pay the supplier the inflated contract price for the goods, thus, unknowingly reimbursing the supplier for the ten percent that the supplier had already provided to Iraq. As a result of this conduct, the UN Escrow Account lost the benefit of more than $1 billion.

---

[1]  The side agreement was not provided to the UN when the Oil for Food contract was submitted and approved. This was in violation of the Program and U.S. and international trade sanctions against Iraq.

16. After the United States invaded Iraq in March 2003, at the request of the provisional government, the UN ceased Iraq's ASSF scheme. The UN required that all pending contracts that had been inflated by ten percent be amended to reflect the true contract value of the goods.

## II. Volvo Subsidiaries Make Illicit Payments to Iraq

17. Volvo and its subsidiaries sell commercial trucks, buses and construction equipment. While the Oil for Food Program was in effect, VCEI and Renault Trucks, two of Volvo's subsidiaries, participated in the sales of trucks, construction equipment, trucks, and spare parts to Iraq through the Program. During this time period, Iraq's various Ministries required the payment of ASSFs in connection with winning contracts to supply humanitarian goods under the Program. VCEI and Renault Trucks acquiesced to the demands of the Iraqi Ministries and paid illegal ASSFs through third-party agents and distributors. VCEI also acceded to Iraqi ministry requests to make additional illicit payments, including one payment to purchase a car. Despite incurring losses on several contracts, Volvo's total gains from profitable contracts in which ASSF payments and other illicit payments were paid or authorized amounted to $7,299,208.

### A. Renault Trucks Makes More than $5.1 Million in Improper ASSF Payments to Iraqi Ministries and Authorizes $1.2 million in Additional ASSF Payments

18. Renault Trucks manufactures truck-tractors and rigid trucks. Commercial bodybuilders outfit the chassis and cabs produced by Renault Trucks with the trailers or superstructures, commonly referred to as "bodies," necessary to tailor the trucks to the buyer's specifications. During the Oil for Food Program, Renault Trucks contracted with Iraqi ministries, including the Ministry of Oil, for the purchase of such specialized

vehicles. Between November 2000 and July 2001, Renault Trucks entered into at least eighteen contracts under the Program. Renault Trucks then sub-contracted out the body-building work requested by the Iraqi ministries to various bodybuilding companies. The bodybuilder performed the requested work on the vehicle and charged Renault Trucks for the modifications.

19. In order to mask the payment of ASSFs to the Iraqi ministries, Renault Trucks employees devised a scheme in which the bodybuilders facilitated the payment of the fees to Iraq. The bodybuilders would add the cost of the ASSF into the cost of the bodybuilding work and submit the total cost to Renault Trucks for payment. The bodybuilders then passed the ASSF payments to Iraq. Renault Trucks internal documents discuss the fact that had Renault Trucks made the payments in its own name, "we would have been caught red-handed." One bodybuilder agreed to sign side letters agreeing to the ten percent ASSF on Renault's behalf, and agreed to send Renault an invoice for the ten percent so that Renault would have paperwork to cover the illicit payment.

20. The ASSFs paid on behalf of Renault Trucks' eighteen Program contracts totaled approximately $5,103,941. The payment of the ASSFs were, in some cases, described as Bodybuilder fees and recorded as such on the company's books and records. Renault Trucks authorized, but did not pay, an additional $1,255,922 in improper ASSF payments to obtain seven additional contracts.[2]

---

[2] Because the sale was not completed and the ASSF was not paid by the time of the U.S. invasion of Iraq in March 2003, the UN required that Renault Trucks amend the contracts, lowering its price to remove the ASSF in order to process each of the contracts.

7

>    B.  **VCEI Authorizes More Than $103,000 in Kickbacks Prior to the Imposition of ASSFs, and then Authorizes More than $2.2 Million in ASSF Payments**
>
>        1.  VCEI Makes Illicit Payments, Including the Payment to Purchase a Car

21. VCEI sells heavy construction equipment, including excavators and wheel loaders. From October 1999 to July 2000, VCEI entered into four contracts under the Program prior to the imposition of the ASSF requirement by Iraq. On three of these contracts, VCEI made illicit payments to Iraqi ministries in two ways. First, VCEI internal documents for two of the contracts evidence illicit payments were kicked back to Iraq that totaled between 5% and 11.27% of the contract value. These payments were made by VCEI through its agent to various Iraqi ministries to obtain or retain business. An internal VCEI document even discusses the extra trips VCEI staff had to make to Iraq in order to make the payments, and the possibility of having to give more than just these payments to obtain additional business. VCEI added the amount of these kickback payments to the commission payments made to an agent, who then gave the money to Iraq's State Oil Marketing Organization ("SOMO"). The agent was a Jordanian consulting firm (Jordanian Agent).

22. On the first two contracts, illicit payments of $30,506.50 and $37,909 respectively, were made to SOMO. These payments were in violation of VCEI's policies against payments to secure business. They were also incorrectly identified as commission payments to the agent. On the fourth contract, VCEI gave the Jordanian Agent a total of $15,950 as "the commitment to the third party whom support us and VOLVO to gain orders in the said ministry." This contract involved the Ministry of

8

Housing and Construction, and was made to secure business. These payments were invoiced as consultant expenses, and incorrectly recorded in VCEI's books and records as commission payments.

23.     The second method VCEI used to make kickbacks to Iraqi ministries was to purchase a car for the ministry. VCEI internal documents on the third contract show that $19,000 was given to the Jordanian Agent to purchase a car for the Ministry of Interior. VCEI did not disclose in the UN contract that it was providing a car to the Iraqi ministry. The payment of $19,000 for the purchase of a car was listed on VCEI's books and records simply as a cost of sale.

### 2. VCEI Makes ASSF Payments to Obtain Business

24.     After the imposition of the ASSF requirement, VCEI or its distributors entered into five additional contracts with Iraqi ministries that involved the payment or authorization of illicit ASSFs. These contracts were entered into between December 2000 and October 2002. VCEI employees learned of the demands for ASSF payments when a Swedish commercial delegation of VCEI employees visited Iraq in November 2000. The trip included a visit to the Baghdad International Trade Fair. In a November 11, 2000 internal memorandum discussing the trip, the employees noted that the ASSF demand "appears to be a clear violation of the UN Embargo Rules that we are expected to participate in." The VCEI personnel then sought guidance from the Swedish Embassy in Amman, Jordan as to how to respond to the ASSF demands. The Swedish Embassy sent a letter to the U.N. on December 3, 2000, reporting that it had heard that Iraq was making demands for ASSF payments. The letter noted that VCEI (which was not identified by name) had informed the embassy that it would refuse to sign the contracts. However,

records show that VCEI went forward with entering into transactions that included ASSF payments. In a December 4, 2000 e-mail, VCEI personnel discussed the need for handling the ASSF payments with "utmost discretion."

                i.        <u>VCEI's Direct Sale to Iraq</u>

25.    In December 2000, VCEI directly entered into a contract with an Iraqi ministry that included an ASSF payment. The contract, including the inflated price to account for the ten percent ASSF, was submitted to the U.N. and approved. VCEI did not notify the U.N. that the contract price was inflated to cover the ASSF payment. Soon after this direct contract was signed, VCEI began working with the Jordanian Agent on additional contracts. VCEI later entered into a written agreement with the Jordanian Agent to act as its agent and backdated the agreement to cover the pending contract. By the time the goods were ready to ship to Iraq one year later, in December 2001, the Jordanian Agent informed VCEI that the ASSF had been paid by the Jordanian Agent to the Iraqi ministry. The Jordanian Agent then invoiced VCEI for its commission on the sale, including reimbursement of the ASSF payment.

26.    An ASSF payment of approximately $317,335 was made by the Jordanian Agent on VCEI's behalf to a bank in Jordan. The payment of the ASSF was described as a consultation fee and recorded as commission payments to the agent in VCEI's books and records.

                ii.       <u>VCEI Makes Additional ASSF Payments by Using the Jordanian Agent as a Distributor</u>

27.    Soon after this direct contract was signed, VCEI began working with the Jordanian Agent on additional contracts. Following its payment of an improper ASSF in

10

connection with its direct sale to Iraq, VCEI changed its method of doing business for future contracts in an effort to distance itself from the payment of the improper ASSFs. VCEI decided to make the Jordanian Agent its distributor, rather than simply its agent. As a distributor, the Jordanian Agent purchased vehicles directly from VCEI for its own account. The Jordanian Agent, in turn, then sold VCEI products to Iraq and submitted its own inflated contracts to the U.N.[3] Thus, VCEI was no longer the party named on the inflated contracts to the U.N., but rather, the Jordanian Agent was the named party. With VCEI's knowledge, the Jordanian Agent then facilitated payment of the ASSF to Iraq. Through this mechanism, VCEI was able to move its goods into Iraq, but keep itself distanced from any involvement in the ASSF scheme. The Jordanian Agent did not have the infrastructure that normally would have been required by VCEI for its distributors, and VCEI did not enter into any written distributorship agreement with the Jordanian Agent as was required by company policy. VCEI sold its products at a price that ensured the Jordanian Agent would have enough "spread" to enable the agent to make the ASSF payment.

28.    The Jordanian Agent entered into two contracts with Iraqi ministries for the sale of VCEI products, and made $217,912 in ASSF payments in connection with these contracts. According to a U.N. report of an interview of the Jordanian Agent, the agent admitted that he personally paid kickbacks on behalf of VCEI.

### iii.    VCEI's Sales Through a Tunisian Distributor

29.    Following a business dispute with the Jordanian Agent, VCEI began using an established Tunisian distributor ("Tunisian Distributor") to facilitate additional sales

---

[3]    The contracts submitted to the U.N. were inflated by the ten percent that was secretly being kicked back to Iraq by the Jordanian Agent.

11

of its products to Iraq during the Program. VCEI did not enter into a written agreement with the Tunisian Distributor. Like the Jordanian Agent, the Tunisian Distributor purchased equipment directly from VCEI for its own account. The Tunisian Distributor, in turn, then sold VCEI products to Iraq and submitted its own inflated contracts to the U.N.[4] Thus, VCEI was no longer the party named on the inflated contracts to the U.N., but rather, the Tunisian Distributor was the named party. With VCEI's knowledge, the Tunisian Distributor then facilitated payment of the ASSF to Iraq. Through this mechanism, VCEI was able to move its goods into Iraq, but keep itself distanced from any involvement in the ASSF scheme. VCEI reduced its prices to the Tunisian Distributor to enable the distributor to make the ASSF payment.

30. The Tunisian Distributor entered into one contract with an Iraqi ministry for the sale of VCEI products, and made $567,142 in ASSF payments in connection with this contract. The Tunisian Distributor authorized, but did not pay, an additional $1,132,497 in improper ASSF payments in connection with an additional contract.[5]

### III. Volvo's Failure to Maintain Adequate Internal Controls

31. Volvo failed to maintain a system of internal controls sufficient to ensure that the company's transactions under the Oil for Food Program were executed in accordance with management's authorization and to maintain accountability for the company's assets. As discussed above, Volvo's subsidiaries made numerous illicit

---

[4] The contracts that the Tunisian Distributor submitted to the U.N. were inflated by the ten percent that was secretly being kicked back to Iraq by the distributor.

[5] Because the sale was not completed and the ASSF was not paid by the time of the U.S. invasion of Iraq in March 2003, the UN required that the Tunisian Distributor amend the contract price to remove the ASSF in order to process the contract.

12

payments that contravened the Oil for Food Program, U.S. and international trade sanctions, and its own internal FCPA and anti-bribery policies.

32.     Although Volvo knew of endemic corruption problems in the Middle East, it appeared to take on faith, without adequate confirming steps, that its managers and employees were exercising their duties to manage and comply with compliance and control issues. In addition, VCEI entered into a backdated written agency agreement with the Jordanian Agent. Later, when it made the Jordanian Agent its distributor, VCEI did not enter into a written distributorship agreement with agent as required by company policy. In addition, the Jordanian Agent did not have the infrastructure that normally would have been required by VCEI to allow a company to become a distributor. In addition, VCEI sold its products at a price that ensured the Jordanian Agent would have enough "spread" to enable the agent to make the ASSF payment. VCEI also reduced its prices to enable its Tunisian Distributor to make the ASSF payment.

33.     In nineteen transactions that Volvo subsidiaries entered into directly with Iraqi ministries, a portion of the subsidiaries' sales price for goods to Iraq constituted ASSF payments in violation of U.N. regulations and trade sanctions, and also Volvo's FCPA and anti-bribery policies. In three additional transactions entered into by distributors, Volvo's subsidiary, VCEI, knew or was reckless in not knowing that the distributors were paying ASSFs and were submitting inflated contracts to the U.N. In fact, in each of those instances, VCEI specifically changed its business relationship with its agent in an effort to conceal VCEI's involvement in the sales of its products to Iraq in which ASSF payments were made. Four additional VCEI transactions included other illicit payments, including the purchase of a car, in violation of the company's internal

13

policies prohibiting such payments. Finally, on eight additional transactions, ASSF payments were authorized, but not made because the provisional government required the relevant Volvo subsidiary or distributor to reduce the inflated contract price by ten percent. Moreover, as evidenced by the extent and duration of the improper ASSF payments made by two Volvo subsidiaries and their distributors, the improper recording of these payments in the company's books and records, and the failure of Volvo's management to detect these irregularities, Volvo failed to devise and maintain an effective system of internal controls to prevent or detect these violations of the FCPA, as required by Exchange Act Section 13(b)(2)(B).

## V.   Volvo's Failure to Properly Maintain Its Books and Records

34.     As described above, Volvo's accounting for its Oil for Food transactions failed properly to record the nature of the company's kickback payments. On numerous transactions, a portion of Volvo's subsidiaries' sales price for goods to Iraq constituted ASSF payments in violation of U.N. regulations and trade sanctions, and also Volvo's FCPA and anti-bribery policies. In the instances in which the ASSF payments were made, either directly by a Volvo subsidiary, or by an agent or bodybuilder, the Volvo subsidiary failed to properly designate those payments, characterizing some as commission payments, and others as bodybuilder fees. The books and records also failed to identify the other illicit payments, including the payment used to purchase the car. Thus, Volvo failed to accurately record these payments in its books, records, and accounts to fairly reflect the transactions.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**[Violations of Section 13(b)(2)(A) of the Exchange Act]**

35. Paragraphs 1 through 34 are realleged and incorporated by reference.

36. As described above, Volvo, through its officers, agents, consultants, representatives, and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

37. By reason of the foregoing, Volvo violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### SECOND CLAIM

**[Violations of Section 13(b)(2)(B) of the Exchange Act]**

38. Paragraphs 1 through 37 are realleged and incorporated by reference.

39. As described above, with respect to illicit payments made in connection with Volvo's subsidiaries' and their distributors' sales to Iraq, Volvo failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to maintain accountability for its assets.

40. By reason of the foregoing, Volvo violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A. Permanently restraining and enjoining Volvo from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (B)];

B. Ordering Volvo to disgorge ill-gotten gains, with prejudgment interest, wrongfully obtained as a result of its illegal conduct;

C. Ordering Volvo to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

D. Granting such further relief as the Court may deem just and appropriate.

Dated: October 20, 2008

Respectfully submitted,

Cheryl J. Scarboro (D.C. Bar No. 422175)
Tracy L. Price
Kelly G. Kilroy

Attorneys for Plaintiff,
U.S. Securities and Exchange Commission
100 F Street, NE
Mail Stop 6030 SPII
Washington, DC 20549-6030
(202) 551-4403 (Scarboro)

08-473
JR

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS
U.S. Securities & Exchange Commission
100 F. Street, NE
Washington, DC 20549-6030

noy

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS
AB Volvo
40508 Goteborg
Sweden V7

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Cheryl J. Scarboro, Tracy L. Price, Kelly G. Kilroy,
U.S. Securities & Exchange Commission,
100 F. Street, NE, Washington, DC 20549-6030
202-551-4403 (Scarboro)

ATTORNEYS (IF KNOWN)

Case: 1:08-cv-00473
Assigned To : Robertson, James
Assign. Date : 3/20/2008
Description: General Civil

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

⊙ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction
Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ⊙ E. General Civil (Other)  OR  ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

V. ORIGIN
● 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
15 U.S.C. § 78u(d)-(e) (2006) and 15 U.S.C. § 78aa (2006)

VII. REQUESTED IN COMPLAINT   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐   DEMAND $ _____   Check YES only if demanded in complaint
JURY DEMAND:   YES ☐   NO ☒

VIII. RELATED CASE(S) IF ANY   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 3-20-08   SIGNATURE OF ATTORNEY OF RECORD _____

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.